GRAFF, WASHBOURNE & DUNN v. WEBSTER et al.

(Circuit Court, E. D. New York. July 26, 1911.)

1. PATENTS (§ 252*)—INFRINGEMENT—DESIGNS.
    Whether a design infringes a design patent cannot be determined solely by looking to the elements or the details in carrying out the parts of the design, but the test is whether or not the person desiring to obtain

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

an article bearing the original design would be deceived or induced to purchase the imitation because of its similarity.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 394-396; Dec. Dig. § 252.*]

2. PATENTS (§ 252*)—INFRINGEMENT—DESIGN.

Infringement of a patent for a design for silver plates, dishes, etc., is not avoided by piercing the border of the plate or dish in certain parts of the pattern, which was a well-known decorative means, where the patented design would apply as well whether pierced or not, and where the patentee also in practice used such piercings.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 394-396; Dec. Dig. § 252.*]

3. PATENTS (§ 173*)—DESIGNS—DOUBLE PATENTING.

An inventor may patent a component detail of a design, and at the same time an arrangement of that design with the addition of a particular style of chasing, without either patent being open to attack as invalid for double patenting.

[Ed. Note.—For other cases, see Patents, Dec. Dig. § 173.*]

4. PATENTS (§ 328*)—VALIDITY AND INFRINGEMENT—DESIGN FOR SILVERWARE.

The Graff design patents, No. 39,992, for a design for silver plates, dishes, etc., and No. 40,009, for a detail of a border section of the same design, do not show a case of double patenting, nor is either invalid as not the invention of the patentee; both also *held* infringed.

In Equity. Suit by Graff, Washbourne & Dunn against Frederick H. Webster and Hawley T. Webster. Decree for complainant.

Philipp, Sawyer, Rice & Kennedy (C. J. Sawyer, of counsel), for complainant.

Nicholas M. Goodlett, Jr., for defendants.

CHATFIELD, J. The complainant is an extensive manufacturer of solid silverware, while the defendants have a large factory producing principally plated silver. This action has to do with two design patents, for which applications were filed at the same time, but which were issued a few days apart, for reasons which have nothing to do with this case.

It appears from the testimony that late in the spring of the year 1907 Mr. Graff, president of the complainant company, learned of a demand for a design for solid silver dishes, which would furnish an attractive and handsome series of articles without using high relief and the elaborate engraving of patterns previously produced by the complainant. A flat pattern known as the "French design," and which has been applied to plates, platters, compotes, and various other dishes, was produced within the next few months. The process of production seems to have been to make a sketch of the general outlines and parts of the design, then to model this in some plastic material which would show the proportions and relations of the details, and, after the modeling indicated a satisfactory result, to proceed with the making of dies for the actual stamping and cutting of the silver. The making of this particular design was proceeded with in secrecy until it was placed upon the market, and it was then treated as the private property of the complainant until the year 1909, when the defend-

ants, having observed the popularity of this French design, and also believing that it could be reproduced in plated silver, prepared certain articles which were copies of the complainant's solid silver articles of the same sort, with this so-called French design. An intimation of this copying reaching the complainant's ears and two years not having elapsed since the design was first conceived of, Mr. Graff applied for the design patent referred to.

One phase of the case can be disposed of upon the preceding statement. No claim of unfair competition enters into the case. The use of the design in solid silver was not of such a nature, nor had it been so well recognized by the public, that any question of deception or substitution for the complainant's article would be involved in making a plated article of a similar sort, nor had any trade-mark rights been acquired. The complainant therefore sought to protect itself in the only way open to it; that is, by patenting the design. Upon learning of this action, the defendants decided that they did not desire to copy the design of another party when the issuance of a patent showed that they did not have the right to use it, and they also wished to avoid the possibility of an infringement suit. The defendants therefore deliberately, after consultation with their advisor, had made up the design now used by them, which was subsequently patented by their designer, and which has been applied to plates, platters, and dishes throughout the same general class of work as was already upon the market in solid silver but with the complainant's design. The testimony shows plainly that the complainant's design was made up of many old ideas and methods of ornamentation. Designers such as Graff and his employé, Saunders, were cognizant of the general use of scrolls, leaves, festoons, garlands, flowers, and piercings, either in parallel lines or in concentric circles. It was also old to use these elements in such combinations that they could be reproduced around the rim or edge of a plate or dish, and, when so used, it was well known in the art that some connecting design or member of the combination would be necessary if the separate parts of the design did not entirely fill the space desired to be decorated. Further, it appears that each designer has certain individual characteristics, and that a tendency to use certain curves or direction of turn in scrolls, certain shapes of leaves in festoons or garlands, and definite systems of shading or modeling will be present in the work of each designer or modeler, and that a mere change because of this personal peculiarity in the method of carrying out the design is not always a change in the design itself, if the appearance and effects are substantially the same. The defendants, knowing these facts, made their design from elements that could be used by any one, but endeavored to combine them in such a way that they would be free from the charge of having produced a design like that protected by the patent, but yet so that the pattern would be salable in a plated or cheaper product to serve the identical purpose and meet the fancy or taste of the purchasers who would be attracted by the French design of the complainant, and who might appreciate the ability to secure it at a lesser price, at a sacrifice of the personal satisfaction or vanity involved in possessing it in solid

silver. The complainant from this also alleges that the sale of the solid silver articles is hindered or defeated by the idea of intending purchasers that they do not desire a pattern in solid ware that can be obtained by others in plated silver.

[1] Hence, to determine whether a design infringes a design patent, we cannot look solely to the elements nor the details in carrying out the parts of the design, but the test, somewhat like that applied in the case of unfair competition, is whether or not the person desiring to obtain an article bearing the original design would be deceived or induced to purchase the imitation because of its similarity, and whether there is likelihood of users or casual observers not noticing the distinction. Or, again, whether purchasers, not having in mind the details of the design, but having their attention called to either the original or the imitation, would fail to carry away those details in their memory, and having been pleased with the general appearance would, upon seeing the similar pattern, conclude that the plated ware or the imitation design, of a generally similar appearance and at a cheaper price, was a copy of the solid pattern. Hutter v. Broome (C. C.) 114 Fed. 655; Gorham Mfg. Co. v. White, 14 Wall. 511, 20 L. Ed. 731.

The testimony of experts or of ordinary witnesses as to their opinion of the likelihood of deception may be some guide in furnishing statements as to the points of similarity which must be compared by the court. But the determination as a matter of law that one design is so near like another patented design that it constitutes an infringement of the latter, must be passed upon by the court, and it would be more helpful to have the testimony of the experts confined to the various elements or details which would make for or against deception, rather than to merely state their conclusions as to what the court should decide. Hence many of the questions in the present record can be used by the court, but cannot be taken in the precise form in which the answer is stated. A comparison of two designs does not produce entirely the same result as a comparison of two dishes, one solid and one plated, and the customers or the public who are to be considered customers must deal with the dishes upon which the design is used, while the court has to pass upon the information disclosed by the patent containing drawings and specifications of the design. But it can also consider that information as exemplified by the specific objects constructed after the patent or in alleged violation thereof.

In accordance with the ruling of the Patent Office and the decision of the courts (such as Dobson v. Dornan, 118 U. S. 10, 6 Sup. Ct. 946, 30 L. Ed. 63; Cheney Bros. v. Weinreb, 157 Off. Gaz. Pat. Off. 1002), design patents no longer attempt to describe in literary parlance the effect of the ocular sensation conveyed by the drawings, and the court in the present instance must limit the scope of the complainant's design patent to the discovery or teaching shown in the patent, and must examine the exhibits; that is, the silver dishes themselves, with this fact in mind.

[2] The testimony of the complainant's witnesses has pointed out that the use of a border, flat, richly ornamented, and yet conveying the

impression of a light, attractive design, has been made particularly effective by the use of the piercings which were already well known as a decorative means both in porcelain and metals, in all kinds of designs, including borders. The complainant's design patent does not mention in the specifications anything about piercings. The drawings are not consistently exclusive of a smooth flat surface, instead of a pierced section, nor do they satisfactorily indicate that the complainant intentionally endeavored to describe and retain to its own advantage both the method of piercing and of using instead depressed or raised flat surfaces. The design, therefore, as disclosed by the patent, has to do with an arrangement of lines or parts (some of which might be perforated or might have solid smooth surfaces, instead of perforations). In practice the complainant has always used piercings, and the defendants as well (both in the original copy, which was discontinued, and in the new design which was made up to serve the purpose) use nothing except what has been considered as a pierced border. It would seem that either customers or casual observers would carry in their minds an openwork pierced design as a distinguishing element, in connection with the idea of a silver or metallic substance which such a plate would suggest to them. To say, therefore, that the defendants' design does not infringe because they merely use the same form of the design which the complainant uses, would be like holding that an engine patent could not be infringed because both the patentee and the alleged infringer confined the use of that engine to a motor boat, when according to the patent it might be applicable for a number of other purposes.

The court must conclude, therefore, on this point, that if the use which the defendants make of the design is an infringement of the design, whether pierced or not, they cannot escape because their use is exactly the same as that of the complainant, and because the complainant in describing its patent made it possible to give the design a double significance, and in effect to cover two distinct styles, in reality alike in every detail except the piercing, which was not new and which could be used on any design, even if thereby it were made so attractive as to be more readily salable.

The defendants also suggest that, as has been indicated, their completed dish, with their design applied, may resemble in general appearance the complainant's completed dish with the complainant's design applied, but that their design does not resemble the complainant's printed design as shown in the patent. Soehner v. Favorite Stove & Range Co., 84 Fed. 182, 28 C. C. A. 317. This is but another form of presenting the same argument which has just been considered. The court must look to the form allowed by the Patent Office for the teaching of the patent, but within a legitimate application of that patent, and within the use of the design shown thereby, similarity between the products, when used in the same way, would indicate that the design was infringed, and not that the application of the design by both parties was a change from the patent.

The defendants attack the complainant's patents, however, in a more serious manner by pointing out that the first patent of the com-

plainant, No. 39,992, granted May 18, 1909, of which the following is a general reproduction of the actual design:

—was patented to be and expressly stated to be a design for a plate or dish made up of the border section which has been referred to in the testimony as the French border, with a chased or engraved design, beginning at the inner scroll of the border and extending over the concave rim, into the body or surface of the plate or dish. It would appear that the use of an inside scroll and also of chasing or engraving so as to conceal and embellish the curved rim to the dish part of the piece of silver was new in the Graff design, and some of the elements of attractiveness of the French border silverware seem to have come from the use of this scroll and of engraving where engraving was employed. But the second Graff patent, No. 40,009, granted May 25, 1909, of which the following is a sketch:

—describes what has been referred to as a border section; that is, one of the uniform portions of the border, repeated as often as necessary around the circumference of the dish.

[3] The defendants claim that even if the applications were filed at the same time, and admitting that the issuance of a design patent does not establish priority of rights (inasmuch as this is controlled by the Patent Office and not by the patentee), nevertheless when Mr. Graff applied for a design for an entire plate, showing as a part thereof a complete section, which could be used for repetition in any way desired in the same way that a painted landscape or head could be taken from a composite design and reproduced in places where such a detail was desired, he anticipated his second application, even though by only a moment, and that the second application—that is, the patent for a detail or section of the design to be used in making up the border—is therefore invalid as double patenting. Miller v. Eagle, 151 U. S. 186, 14 Sup. Ct. 310, 38 L. Ed. 121; Palmer Pneumatic Co. v. Lozier, 90 Fed. 732, 33 C. C. A. 255.

It can be seen that the idea of using such a design as a border section was not new nor patented by Graff. His border section patent was intended to cover solely the design of that section, and this design was the same as the design of the various sections in the other patent. If the plate design patent had been issued, and then Graff had suddenly seen that some part of it was applicable for use as a border, when the design patent showed that was already being used as a border, it would not be patentable, unless some invention were applied to the use indicated in the new patent, or some invention occurred in the design itself. Neither of these elements is present in this case, and yet it would seem that a man could patent some component detail of a design, and at the same time could patent an arrangement of that design with the addition of a particular style of chasing, and not have either patent open to the attack of invalidity, in so far as they did not conflict with each other. Hence neither of the Graff patents renders the other invalid, but each must be taken as disclosing solely the invention claimed; that is, the border section patent protects nothing but the design for use as a section. The plate design patent protects nothing but the arrangement of sections and chasing designs in a plate like or substantially like from the standpoint of design, the one shown in the patent.

[4] Considerable testimony was devoted to an investigation of the defense that Mr. Graff was not the actual inventor of the French border, but that Saunders, who was then in the employ of the complainant and did the modeling for the design, really produced the ideas of the design itself. This testimony shows that Saunders was a man of considerable ability and of much originality and independence. He has had considerable experience in modeling and in certain kinds of designing, and since leaving the employment of the complainant has been engaged in sculpture work and designing colossal monuments. His ability to design the French border might readily have been admitted, if he had actually conceived the idea. It would follow that if he had designed the border, and Graff had claimed the invention, Graff, Washbourne & Dunn, as assignees, would not be entitled to the sole use of the design, for the patent would be open to attack as not the invention of the patentee. Certain lines in the design, the shape of the scroll ends, and general contour of detail are testified to by some

of the witnesses to show the handiwork of Saunders, but, inasmuch as the working out of the design and the actual modeling was done by him, his handiwork ought to appear therein. He undoubtedly submitted on request a number of sketches to Graff, and they talked over what the design should be, but a reading of the testimony of both Graff and Saunders, and also of the other witnesses, leads the court to conclude that the idea for the French border was formulated in the mind of Graff, and that his sketches or suggestions embodied the valuable points of this idea to such an extent that, while Saunders may have deserved credit, he was not deprived of the right to patent the design as his design, and that he is only entitled to be given the credit which is due in the way of reputation for working out such a successful commercial article, and for grasping the desired idea, with the elements of the design as sketched by Graff.

A further defense is presented by the use of a design on silverware furnished to Black, Starr & Frost, a large jewelry house in Manhattan. This design is known as "Line 59," and is manufactured by Graff, Washbourne & Dunn solely for Black, Starr & Frost. The evidence shows that, as between the complainant and Black, Starr & Frost, the right to use this design, even for the purpose of furnishing an exhibit in this case, was completely controlled by Black, Starr & Frost under their contract. The design known as Line 59, which is illustrated by the following border section:

—was prepared after the patenting of the French border so as to give Black, Starr & Frost an exclusive pattern of a similar nature to the French border, and yet one which would suit the particular customers of Black, Starr & Frost, who might feel that they were willing to pay for the knowledge that no other firm sold silverware like the pattern in question.

It is contended by the complainant that this pattern, Line 59, does not resemble the French border. But it must be held that if the defendants' design, made up of component parts which the defendants had a right to use, infringes the patents of the complainant, then Line 59 resembles the patented design enough to limit the patent to a much more narrow scope, and, in effect, confines it to the essential details, rather than to any design approximately similar in appearance. Its general conformation and appearance indicate immediately its source,

and it is hard to see how purchasers could avoid having some difficulty in distinguishing the complainant's French border from Black, Starr & Frost's Line 59, unless they were endeavoring to find some way of deciding which was sold by Black, Starr & Frost, and which was not. In other words, the Line 59 design is easily identified, if identification is desired, but in general appearance and in the likelihood that one would be taken for the other when made of solid silver the complainant's patent is certainly affected by the general similarity. The defendants claim the use of Line 59 as an unpatented design is an abandonment of the patent, except as limited to an exact reproduction in all details. The Line 59 design appears not to have been used until after the defendants had placed their product upon the market and after the patent had been issued. The complainant has marked all of its own goods with the number of the design patent. It has not intentionally or knowingly given the right to the public or to any individual to use this design, as limited by the use of Line 59, without protecting that use by the presence of the notice required by statute. It disputes the claim of the defendants that Line 59 makes use of the same design, but also contends that the defendants cannot urge the free use of Line 59 as a defense herein, even if the patent be limited thereby.

Whether Black, Starr & Frost, or some one acting for them, might insist on the right to use the pattern known as Line 59 without hindrance on the part of the complainant, is not a defense unless the complainant has, by giving this right, allowed the use of the design contained in the patent so as to indicate an abandonment of the patent, whether that action was conscious or unconscious on the complainant's part. The general resemblance between the complainant's silverware (either in the form of dishes or of a plate like the Design Patent No. 39,992), the defendants' silverware, and the silverware of the design known as Line 59, at first impression appears to be great. If the defendants' border had been made up to imitate Line 59 rather than the patented border, the resemblance would seem to be sufficient to relieve the defendants from the intent, at least, to make use of the patented border; but the testimony shows that such was not the case. The defendants' border was planned to fill the wants of customers who would be attracted by the beauty of silverware like the patented design. The perforation or piercing as used both by complainant and by the defendants (and as justified by the patent) with an inner and outer scroll border, and even more when united with chasing upon the surface of the plate, causes a resemblance so great that the difference in detail would escape the eye of the casual observer. The piercing in Line 59, however, is differently arranged, and of itself constitutes a greater departure from the patent than is shown in the defendants' border. The flat features of the design and the use of the scroll are substantially the greatest points of resemblance between the complainant's border and Line 59, and to that extent the complainant seems to have abandoned its patent or limited its scope. But to hold that the complainant is not entitled to an injunction against the defendants, who use a design that imitates in so many features the complainant's pat-

ent, because Line 59 (subsequent to the creation of the imitation but prior to the termination of the suit) limited the complainant to one style of the design, would not be justifiable in a strict consideration of the parties' rights in view of the three designs. The defendants' design, so far as it infringes, has enough separate elements of injury to the complainant's rights and of differentiation from the relinquishment of those rights shown by the design Line 59 to entitle the complainant to a decree, even though the defendants' border has been partially freed from the charge of infringement by the complainant's own act in making the Line 59 design.

The use of piercing, as has been said, is justifiable as a part of the patented design, and is not such an undisclosed dominant feature as was made the basis of the decision in Ashley v. Samuel C. Tatum Co. (C. C. A.) 186 Fed. 339. The ornamentation produced by piercing is shown both in the drawings of the patent and in practice in all three designs, and it cannot be said that the resemblance in the defendants' border is created by something not specifically claimed in the drawings of the patent, solely because, as has also been pointed out, the complainant did not limit its drawing to the use of piercing, to the exclusion of an alternative solid surface.

On the whole case, therefore, it must be held that, while the complainant's rights have been materially narrowed by its own act in the production of the Line 59 design, yet sufficient infringement has been shown and sufficient of the patent still retains validity to hold that the defendants should be enjoined from producing the particular border section with reference to which this action has been brought.

The complainant may have a decree.